IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

CLAYTON STEWART                                                              PLAINTIFF

v.                          No. 3:21-cv-75-DPM

VICTOR GARCIA, Individually
and in his Official Capacity as a
Police Officer in and for the City
of Jonesboro, Arkansas; RICK
ELLIOT*, Individually and in his
Official Capacity as Chief of Police
for the Jonesboro Police Department;
CITY OF JONESBORO, ARKANSAS;
and JOHN DOE 1–10                                                         DEFENDANTS

ORDER

**1.** Clayton Stewart was paralyzed from the chest down when he fell from a tall fence after being tased by Jonesboro Police Officer Victor Garcia. He has sued Officer Garcia, Chief of Police Rick Elliott, and the City. He makes various federal law and state law claims. The defendants seek summary judgment. Stewart presses for a trial. Most of the material facts are undisputed. Where there is a dispute, the Court takes the record in the light most favorable to Stewart. *Oglesby v. Lesan*, 929 F.3d 526, 532 (8th Cir. 2019).

---

*The Court directs the Clerk to update the docket: Chief Elliott's name has two t's.

Around 12:45 a.m. on an April morning in 2018, JPD dispatchers received a call reporting that a man was beating his girlfriend in an apartment at the 900 block of Melrose Street. Officer Garcia responded and arrived first. Near the 500 block of Melrose, he saw two men wrestling in a parking lot of an apartment complex. As the patrol car approached the men, both took off. Officer Garcia got out and started chasing them. One man—John Russell—stopped, turned toward Officer Garcia, and said "that's him." Stewart continued to run east toward a fence. Officer Garcia yelled at him to stop. Stewart ignored the warning and tried to hop the fence. When he failed, Stewart pivoted and ran north behind the apartment complex toward a second fence. Officer Garcia followed at a run, warning Stewart to stop or be tased. He failed to activate his body camera. Stewart kept running and started climbing the second fence—a six-foot privacy fence. *Doc. 30–1 at 52.* Officer Garcia fired his taser at Stewart, who fell on the other side of the fence. Officer Garcia climbed over the fence, jumped down, handcuffed Stewart, and turned on his body camera. The drop, it turned out, was approximately eight feet because this privacy fence was built on an elevated surface.

The video is hard to watch. It begins with Stewart handcuffed, lying face-down in the grass near the fence, and moaning in pain. Stewart did not get up and seems unable to do so. Officer Garcia rolled him on his back and tried lifting him to his feet. He failed.

Stewart groaned that his back was hurting. Approximately fifteen seconds after Stewart's first complaint of back pain, Officer Garcia offered to call an ambulance. During the next few minutes, he asked Stewart four more times if he wanted an ambulance. Stewart refused twice; he did not respond the other times. Officer Garcia nonetheless called for an ambulance. Fellow JPD Officer Christopher Pigg arrived and asked what had happened. Officer Garcia summarized the incident and told Officer Pigg that he thought Stewart was faking an injury to avoid going to jail. Throughout the Officers' conversation, Stewart continued to groan in pain while lying on the ground. Officers Pigg and Garcia decided to move Stewart away from the fence over to Officer Pigg's patrol car. They ordered Stewart to get up and walk; he responded that he couldn't and that his back was hurting badly. The Officers' banter indicates that they still thought he was faking. They got on each side of Stewart, pulled him to his feet, and dragged him to Officer Pigg's patrol car. They sat him on the ground and leaned him against the vehicle.

The Officers interviewed witnesses at the scene. About ten minutes later the ambulance arrived. Officer Garcia gave the EMTs a brief description of the events leading up to Stewart's fall and his alleged injuries. He also told the EMTs that he thought Stewart was faking the injury. EMT Dylan Gibson checked Stewart's lower extremities by pressing on his toenail beds. Stewart reacted by

moaning in pain. Based on Stewart's reaction, EMT Gibson told Officers Garcia and Pigg that Stewart had feeling in his legs. EMT Gibson also told the Officers that, before they took Stewart to jail, he should go to a hospital. Officer Garcia and EMT Gibson then put Stewart into the backseat of Pigg's patrol car. This involved lifting plus some pushing and pulling. During this move, Stewart repeatedly cried out in pain. After he was put in the car, he continued to moan for several minutes while the Officers, EMTs, and witnesses wrapped up their conversations. Officer Pigg drove Stewart to St. Bernards Medical Center. Stewart was later airlifted to Regional One Health in Memphis, Tennessee. There he was diagnosed with a traumatic spinal cord injury, which has permanently paralyzed him from the chest down.

Stewart was eventually charged under four Arkansas statutes: aggravated assault on a family or household member, ARK. CODE ANN. § 5-26-306; assault, ARK. CODE ANN. § 5-13-207; fleeing, ARK. CODE ANN. § 5-54-125; and public intoxication, ARK. CODE ANN. § 5-71-212.

**2.** Some threshold points. Stewart hasn't named any federal defendants or alleged any federal action, so his Fifth Amendment claims drop out. *Jackson v. Stair*, 944 F.3d 704, 709 (8th Cir. 2019). Because he wasn't a convicted prisoner, Stewart's deliberate indifference claim is governed by the Fourteenth Amendment rather than the Eighth Amendment. *Hott v. Hennepin County*, 260 F.3d 901, 905

(8th Cir. 2001). But, the distinction is only for precision—Stewart receives the same applicable protections under each Amendment. *Ibid*. Stewart's official capacity claims against Officer Garcia and Chief Elliott duplicate his claims against Jonesboro. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). His official capacity claims will therefore be dismissed without prejudice. All claims against the John Doe defendants will also be dismissed without prejudice. Those individuals remain unidentified, and the time to amend pleadings has long passed. *Doc. 11 at 1*. Stewart's excessive force, unlawful arrest, and denial of medical care claims under Article II of the Arkansas Constitution and the Arkansas Civil Rights Act, ARK. CODE ANN. § 16-123-101 *et seq.*, track the federal claims. *Graham v. Cawthorn*, 2013 Ark. 160, at 13–14, 427 S.W.3d 34, 44–45. They need no separate analysis.

**3.** Stewart brings Fourth Amendment claims for excessive force and unlawful arrest against Officer Garcia. First, he contends that Officer Garcia's decision to tase him while he was climbing the tall fence was excessive force in the circumstances. Second, he says that Officer Garcia lacked arguable probable cause that Stewart had committed any crime, and therefore his arrest was unlawful.

Stewart's excessive force claim turns on whether Officer Garcia's actions were objectively reasonable in the circumstances. *Carpenter v. Gage*, 686 F.3d 644, 649 (8th Cir. 2012). The Court must consider the situation Officer Garcia confronted, including the severity of Stewart's

alleged crime, whether Stewart posed an immediate threat to Officer Garcia or others, and whether Stewart was actively resisting arrest or attempting to evade arrest by flight.  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  Relying on precedent from another Circuit, Stewart argues that Officer Garcia's decision to tase him while Stewart was in an elevated position constitutes deadly force.  *Compare Bradley v. Benton*, 10 F.4th 1232 (11th Cir. 2021).  The Eighth Circuit, however, has declined to hold that a single taser shock when a danger of falling exists always constitutes deadly force.  It depends instead on all the circumstances.  *Boudoin v. Harsson*, 962 F.3d 1034, 1040 (8th Cir. 2020).

Stewart emphasizes that Officer Garcia was responding to a routine domestic call; and he says that the nature of the crime described in the dispatch wasn't severe enough to justify the tasing.  But Stewart overlooks the details included in the dispatch: there had been a violent incident involving a man beating a woman in an apartment.  *Doc. 30–1 at 22 & 25*.  Officer Garcia also saw two men wrestling in a parking lot a few blocks from the address where the incident supposedly occurred.  The men fled as his patrol car approached. Stewart has not pointed to any evidence conflicting with Garcia's testimony that several times he told Stewart to stop running and warned him about being tased.  He doesn't dispute running away or ignoring Officer Garcia's warnings.  Although Stewart emphasizes that he was not armed, the relevant inquiry is whether Officer Garcia knew

-6-

or reasonably should have known that Stewart was unarmed. Officer Garcia testified without contradiction that he did not know whether Stewart had a weapon.

Stewart also says that when Officer Garcia saw him starting to climb the second fence—a six-foot-tall privacy fence—the Officer should have recognized the fall danger and refrained from using his taser. He emphasizes that tasing a suspect in an elevated position heightens the risk of serious injury. True. Jonesboro Police Department policy makes this very point. It requires officers to "use the lowest level of force based on the situation at hand." *Doc. 30–2 at 119.* The policy also states that "officers shall never use a greater degree of force than that which is lawful, reasonable, and necessary for the specific situation." *Doc. 30–2 at 118.* Officer Garcia admits that he fired his taser after Stewart began climbing the fence. It is unclear exactly how high off the ground Stewart was when he was tased. Nevertheless, Officer Garcia's use of his taser was reasonable in the circumstances. He was responding to a report of serious domestic violence and chasing a fleeing suspect who failed to heed his multiple warnings. Whether to let Stewart escape over the fence, or try to apprehend him by deploying the taser, was a judgment call. Officer Garcia is therefore entitled to qualified immunity on Stewart's excessive force claim. *Boudoin*, 962 F.3d at 1041–43.

Stewart's unlawful arrest claim turns on whether Officer Garcia had at least arguable probable cause to make the arrest. *Smithson v. Aldrich*, 235 F.3d 1058, 1062 (8th Cir. 2000). If so, he is entitled to qualified immunity and the claim fails as a matter of law. Arguable probable cause is a low bar; it exists when an officer makes an objectively reasonable decision in determining, in the fast moment, whether probable cause exists for an arrest. *Ulrich v. Pope County*, 715 F.3d 1054, 1059 (8th Cir. 2013). An arresting officer isn't required to witness the potential criminal activity; he or she may rely on information provided by others, so long as the reliance is reasonable. *Kuehl v. Burtis*, 173 F.3d 646, 649 (8th Cir. 1999). Officer Garcia arrested and charged Stewart with four crimes — aggravated assault on a family or household member, assault, fleeing, and public intoxication. Defendants argue that the facts would support charging disorderly conduct, too. As long as he had arguable probable cause to arrest Stewart for any charge, Stewart's unlawful arrest claim fails. *Foster v. Metropolitan Airports Commission*, 914 F.2d 1076, 1080 (8th Cir. 1990).

Did the circumstances provide Officer Garcia arguable probable cause to make an arrest? *Devenpeck v. Alford*, 543 U.S. 146, 155 (2004); *Hosea v. City of St. Paul*, 867 F.3d 949, 956 n.6 (8th Cir. 2017). Yes. The dispatch call is too factually thin to create arguable probable cause on the charge of aggravated assault on a family member or household member. *Compare* ARK. CODE ANN. § 5-26-306. But the call's report of

–8–

a man beating his girlfriend provides sufficient arguable probable cause on assault—the purposeful creation of apprehension of imminent physical injury in another person. ARK. CODE ANN. § 5-13-207(a). The record also contains more than enough evidence to support that Officer Garcia had arguable probable cause on the flight charge. Stewart ran and ignored Officer Garcia's several warnings to stop or be tased. Stewart knew his "immediate arrest or detention [was] being attempted by a duly authorized law enforcement officer. . . ." And the law required him not to flee. ARK. CODE ANN. § 5-54-125(a). On the public intoxication charge, there aren't enough facts indicating that Officer Garcia thought Stewart was "manifestly under the influence of alcohol or a controlled substance" before the Officer discharged his taser. ARK. CODE ANN. § 5-71-212(a). One reasonable assessment of Stewart's condition *after* the fall was that he was intoxicated and stunned. And Officer Garcia learned the details about Stewart's alcohol consumption and drug use that night only after he'd tased and arrested Stewart. Last, though Stewart was not charged with disorderly conduct, the Court agrees with the defendants that arguable probable cause existed to arrest him on this charge. Officer Garcia saw the skirmish between Stewart and Russell in the parking lot. ARK CODE ANN. § 5-71-207(a)(1). Because Officer Garcia had a sound factual basis to charge several crimes, Stewart's false arrest claim fails as a matter of law.

**4.** Next is Stewart's Fourteenth Amendment deliberate indifference claim. He must show that he had an objectively serious medical need, which Officer Garcia knew about, but deliberately disregarded. *Thompson v. King*, 730 F.3d 742, 746–47 (8th Cir. 2013). Stewart must offer evidence that Officer Garcia's mental state was akin to criminal recklessness; neither negligence nor gross negligence is enough. *Ibid.*

When Officer Garcia got to Stewart, he saw he had fallen approximately eight feet, could not get up, could not stand, and heard him say his back hurt. All this, says Stewart, would have alerted even a lay person that Stewart needed medical attention. He also argues that Officer Garcia knew Stewart had suffered a spinal injury in the fall and nonetheless moved him multiple times, making his injuries worse. As Officer Garcia's body cam footage confirms, after he found Stewart face-down in the grass groaning in pain, he rolled him over and tried to stand him up. Stewart continued to groan and told Officer Garcia that his back hurt. Despite Stewart's complaints, when Officer Pigg arrived, he and Officer Garcia lifted Stewart by the arms and dragged him across the yard where he had landed to Pigg's patrol car.

Notwithstanding these undisputed facts, Stewart's Fourteenth Amendment claim fails. He has a strong argument that these Officers were negligent in how they handled Stewart before the EMTs arrived. But the circumstances as a whole do not show deliberate indifference

to a known spinal injury or other known medical need. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000). There is no evidence that Officer Garcia delayed or denied Stewart access to medical care. *Krout v. Goemmer*, 583 F.3d 557, 567–68 (8th Cir. 2009). He offered to call an ambulance less than a minute after Stewart first complained of back pain. And during the next couple of minutes, the Officer asked Stewart four more times whether he should call an ambulance. Officer Garcia did so. When the EMTs arrived, they examined Stewart and advised Officers Garcia and Pigg that Stewart had feeling in his lower extremities. The fact that trained medical personnel did not appreciate the extent of Stewart's injuries undermines any inference that a line officer should have recognized that Stewart had suffered a spinal injury. *Krout*, 583 F.3d at 569. And Stewart has not provided any evidence that Officer Garcia's reliance on the EMTs opinions was unreasonable. *Reece v. Hale*, 58 F.4th 1027, 1033 (8th Cir. 2023). On this record, no genuine issue of material fact exists on whether Officer Garcia violated Stewart's rights under the Fourteenth Amendment. As a matter of law he did not do so. *Smith v. Lisenbe*, 2023 WL 4483774, at *4 (8th Cir. 12 July 2023).

    **5.** Stewart's supervisory liability claim against Chief Elliott also fails as a matter of law. Under § 1983, a supervisor may be held individually liable if he directly participated in the constitutional violation or if he failed to train or supervise the subordinate who

violated the Constitution. *Brockinton v. City of Sherwood, Arkansas*, 503 F.3d 667, 673 (8th Cir. 2007). Stewart does not contend that Chief Elliott participated in the tasing incident. He argues instead that the Chief failed to train Jonesboro's officers properly on taser use, failed to train them about medical care for injured arrestees, and was deliberately indifferent to these known shortcomings. Stewart, however, has not presented sufficient evidence to show that Chief Elliott had notice of a pattern of taser misuse or inadequate medical care by Jonesboro officers. The Court therefore cannot conclude that Chief Elliott was deliberately indifferent to, or tacitly authorized, these alleged constitutional violations. *Vaughn v. Greene County, Arkansas*, 438 F.3d 845, 851 (8th Cir. 2006).

Stewart's failure to supervise claim also fails for lack of evidence demonstrating that Chief Elliott had notice of a pattern of unconstitutional conduct by Officer Garcia. *Vaughn*, 438 F.3d at 851–52. It's undisputed that this Officer had no prior complaints, policy violations, or disciplinary actions before this incident. One incident is not enough to show that the Chief was aware of either repeated taser misuse or repeated inadequate medical care by Officer Garcia. Chief Elliott is therefore entitled to judgment as a matter of law on Stewart's supervisory liability claim.

**6.** Finally, the municipal liability claims. Jonesboro doesn't have a policy that allows officers to arrest people without probable

cause or a policy that authorizes officers to use more force than what is reasonable in the circumstances. *Szabla v. City of Brooklyn Park, Minnesota*, 486 F.3d 385, 389–90 (8th Cir. 2007). And no question remains for a jury on whether the City had a custom or practice of allowing unconstitutional conduct. *Brossart v. Janke*, 859 F.3d 616, 627–28 (8th Cir. 2017). Stewart must show a pattern. *Perkins v. Hastings*, 915 F.3d 512, 522 (8th. Cir. 2019). He has not done so. The record lacks evidence indicating that the City was deliberately indifferent to a pattern of police officers making unlawful arrests or using excessive force to make arrests.

Stewart also says that the failure to discipline Officer Garcia after an internal affairs investigation found that he had violated two of the Department's policies demonstrates that Jonesboro tacitly authorizes unconstitutional conduct. Captain B.J. Smith investigated this incident. He found two policy violations. He concluded that Officer Garcia violated the City's use of force policy when he tased Stewart in an elevated position and violated the City's body camera policy when he failed to activate his camera before or during the pursuit or the taser deployment. The record is silent on whether Officer Garcia was ever disciplined for these violations. The Court therefore assumes that he was not. This omission is serious. Without more, though, one omission doesn't show that the City was deliberately indifferent to a custom or

-13-

pattern of constitutional violations. The City is therefore entitled to summary judgment on Stewart's claims.

\*   \*   \*

Motion for summary judgment, *Doc. 30*, granted. Stewart's federal claims, along with the echoing claims under Arkansas law, will be dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Stewart's other claims of negligence under Arkansas law. They will be dismissed without prejudice. 28 U.S.C. § 1367(c). Motion to exclude, *Doc. 27*, and motions *in limine*, *Doc. 42 & 45*, denied as moot.

So Ordered.

*WPMarshall Jr.*
D.P. Marshall Jr.
United States District Judge

17 July 2023

-14-